Mr. Chief Justice, and may it please the Court, in 2008, Congress comprehensively overhauled the terrorism exception to foreign sovereign immunity to close gaps that had for years allowed foreign terrorist states to thumb their noses at U.S. judgments, finding them liable for acts of terrorism, while their victims were not. A centerpiece of that legislation is Section 1610G. That provision provides that American terrorism victims can execute their judgments upon the property of a foreign state that is subject against which a judgment has been entered under 1605A, and it makes available the property of the state's agencies and instrumentalities. Well, as provided in this section. The question is what that provision means. The Respondents would have the Court delete the three words between the word execution and the words as provided in this section. What it actually says is that the property is subject to execution upon that judgment as provided in this section. We know what Congress wanted to do away with what they call the bank check factors, and this statute was written perfectly to do just that. You say it does something more. It has to do more, Your Honor. Why does it have to? What the statute did is it made more assets available, because you didn't have to worry whether it was the State itself, an instrumentality of the State, an agency. The property of any of those entities was available. So it swelled the assets that would be available. But it didn't say anything, not a word, about immunity. Well, there's two questions there. It doesn't say anything about immunity, but those are magic words. It does say that the property is subject to execution. Magic words under A and B. I'm sorry? In 1610 in A and B, Congress knew how directly to say property is not or is subject immune from attachment. But it used something very different here. Rather, it says that property is, quote, subject to attachment, as provided in this section. Those are two very distinct formulations. They are different. Subsections A and B were part of the original Foreign and Sovereign Immunity Act from 1976. There were other amendments since then. If you look at subsection F-1, which the President has waived, it says, shall be subject to execution. The Terrorism Risk Insurance Act, which is codified as a note to subsection 1610, also says, shall be subject to execution. So the language, when Congress sat down to write subsection G, it was looking at the other terrorism exceptions to execution immunity that it had already passed, and those were F and TRIA, and it modeled G after those sections. Breyer. Can they execute compliance on the embassy? On the uniform, on the uniforms that the people in the embassy wear? On the papers that the ambassador keeps in his desk? If, in fact, you read, as provided in this section, the answer is no. If you read it to include, because it has to be commercial, all right? Under your reading, where those words must mean something else, can't they do it? They cannot. Why not? Subsection 1609 says that section 1610, execution under 1610 is subject to international agreements, like the Vienna Convention, which would protect diplomatic property. And section 1611 protects military assets, certain central bank assets. Congress, when they enacted 1610G, they did not completely abrogate foreign sovereign immunity for terrorist states. They wanted to provide a remedy for the victims. They wanted to punish and deter the terrorist states. But at the same time, Congress recognized that Iran and North Korea, Syria, Sudan, these are sovereign states, and they are entitled to a bare minimum of sovereign assets while making everything else subject to execution. Alito, what does as provided in this section mean? Am I right? You think it incorporates only procedural requirements? No, Your Honor. What does it mean? It means, the way to read it is it refers to the judgment that's entered under 1605A. As provided in this section, it says execution, you can have execution upon the property. Upon that judgment as provided in this section. As provided in this section modifies the judgment, upon that judgment, and it refers to the section, section 1605A, which is the only section mentioned in this sentence. It's referring back to the section 1605A that was a couple lines above in the same sentence. And what it says is that a judgment that section 1610G, which provides sweeping remedies for terrorism victims, is only applicable to those who hold judgments entered under the statutory cause of action of 1605A. It is not available to other plaintiffs holding terrorism judgments. It also extends, it also extends, as provided in this section, extends the remedies. The remedies, remember, the remedies of 1605A, capital A, are very novel, to say the least. You don't have a private right of action anywhere else in the Foreign Sovereign Immunities Act. You don't have any other provision that allows punitive damages against a sovereign State, which is a sure sign that Congress was not concerned about affronting the dignity of terrorist States. They allowed punitive damages. They expected those to be enforced. They allowed a prejudgment lien of lispendence to attach to all sovereign, all of the State's property, that is, subject to execution under 1610, that including property of any party that the plaintiff identifies as being controlled by that terrorist State. Alito, as provided in this section, is really superfluous, isn't it, under your interpretation? It's not. It refers to, well, it emphasizes the centrality of the 1605 judgment to this provision. And it also, there's no other way to read it. If you read it as the Respondents would, there's no provision within 1610 that can pair with 1610. They say that it must pair with another substantive provision of 1610, but nothing works. Try to go through. It says that 1610g says that the property of a foreign State is subject to execution and the property of an agency or instrumentality. Now, if this were only a veil-piercing mechanism, as the Respondents claim, there is no reason to mention the property of the foreign State. You don't need to pierce the veil to reach the property of the judgment-debtor terrorist State. You just go straight for that property. And if you have a judgment against the agency or instrumentality Sotomayor, I'm sorry. I thought that the University of Chicago had raised an interesting argument, that the definition of foreign State in the statute includes, by definition, an agency or instrumentality of a foreign State, so that the reference to foreign State that you're relying upon does include the concept of piercing the corporate veil in its very definition. Well, that would, that would, that itself would abrogate BANSEC, the rationale that University put forth. Sotomayor, well, not quite, because what, I mean, this provision deals directly in aid of the plaintiffs in the BANSEC case and in the others that had found against plaintiffs. There are at least three cases where a class of plaintiffs were found not to be in a sufficiently tied relationship to the foreign State, and the plaintiffs there couldn't recover. So there was a real issue this was addressing. The fact that there were subsidiaries and agencies of foreign State who had commercial property, and it wasn't being made available to plaintiffs. So the question would be, to ask the Respondents, why they don't mention those cases in their briefs. We have maintained consistently that the property of the foreign State, those words are completely not just superfluous but misleading if there, if this is just a veil piercing mechanism. If it's a veil piercing mechanism. It gave them what those three cases denied them. It gives other plaintiffs with similar claims a lot, access to a lot of, of property that they wouldn't have had under BANSEC. The provisions that allow execution upon the property of an agency or instrumentality gives access to the agency or instrumentality's property. Well, give an example. I mean, there's a famous example, which you probably know about, the letter of Cyrus saying to everybody throughout the Middle East that the Jews are free and they can go back to Israel, Palestine, the Temple, and that letter exists and Persia, Persian letter, and Iran has sent it around the world. Now, in your view, they have, and people have looked at it, and if it comes to the United States, you can seize it. Is that, that's your view of it? Because if it is, of course, if Congress knew about it, then they, they might have had a general idea, given the nature of this stuff in Chicago. I would be surprised that they'd want to do that. You might be surprised, but Congress has a trouncement. Your view is, yes, you could seize it. It would depend on, yes, you could. Congress has addressed this very question twice. In 22 U.S.C. 2459, Congress provided a very specific and limited immunity for culturally significant objects being brought to the United States for display or exhibition. There is a very specific immunity there that the, that somebody wants to bring in that property, those exhibits can apply to the State Department in advance and receive a letter immunizing those assets from judicial process. And, and last year Congress That issue did not exist in, what was it, 1939? It did not. It did not. When Chicago got this? But Congress could have made that provision retroactive, and it didn't through Congress. What about the provision that Congress did enact in, we've been talking about G, and so, so this is subsection 3, refers to nothing shall be construed to supersede the authority of a court to prevent the impairment of an interest held by a person who is not liable in the action. Why isn't the University of Chicago such a person? They're certainly not liable in the action, and they got this property when Iran was not listed as a terrorist state. The Shah was in control, not the Ayatollah. The University hasn't raised that as a defense. And because section 1610G3 refers to a party with an ownership interest, not just a, some other intangible interest, and even to the extent that they do, that doesn't mean that the court should not be able to transfer title to a, to whatever party would be ready to pay the price. And we think it would be Iran, by the way, if the court would construe this statute as Congress, we think, as we read it, Congress would finally, I mean, Iran would finally pay attention to a judgment. And they would say, we're about to lose our, our, our artifacts. What are the terms? The University of Chicago has this since 1939. Iran has never tried to take it back. What are the terms of the lease? They have, they have, it's not a lease. It was a long-term loan for the, for the study and cataloging, publishing, photographing, cleaning of these, of these artifacts. And University of Chicago does not assert an ownership interest. They, they say that they're, in the briefs, they say they're trustees, or they were entrusted, they don't call themselves trustees even. They say they were entrusted with this. Every, they use language, but they never say we have a concrete right in these, in these assets. And if they do, the court can, the district court, when it orders the sale, it can make accommodation for that. It can say that whoever buys it, and we would be, we're, my clients would be perfectly happy if these artifacts were made in the University of Chicago. Ginsburg. Ginsburg. The University of Chicago is not interested in this property for the money, for money. It's interested in having these antiquities on display to be researched, to be seen. But it doesn't belong to them. It's not theirs. And whoever it belongs to can decide whether they're the best University to study it. Ginsburg. You're answering my question that, well, don't worry about the University of Chicago. The district court can give them some money. No, not money. Not money. The district court, if they have a, a right, so they accept that they have a right to retain the, the artifacts and continue their work with them, the district court can say that the sale should be conducted subject to the rights of the University of Chicago. It doesn't, it doesn't mean that it's, it's all, it's not all or nothing. The property can be divided up.  What would those rights be? Their rights have been, from 1939 on, they have this property. Well, since 1980, they've had the property because Iran couldn't get it back for a big part of that time. And for a big part of the time before that, every now and then, Iran was asking, when are you going to finish, when are you going to finish studying these things? And, and they were not very forthcoming. When this lawsuit was filed, they moved into, they expedited their study of the assets because they realized that they might lose them. And now, again, the University of Chicago is really an amicus here. They don't, they have no interest in these assets. They, and to the extent that they do, the court can protect that. It, it can protect that interest in, in a sale. Roberts. Well, assuming you're right, does that mean if you lose here, you think Iran will be able to repatriate the assets? Absolutely. There's nothing in the way. They did, they did. We lost, we lost in the district court, and there was another collection of Iran-owned assets, and on the eve of the, the argument in the court of appeals, they were shipped back to Iran after the court had denied our, our motion to stay, but, but they were shipped back to Iran, and they. There are other things in the United States. I mean, it seems to me so far that the main difference between your interpretation and the other side as a practical matter is that if you're right, that private people will be able to take cultural assets from Persia and sell them and ship them back to Iran, and if they're right, you will have to limit your recovery to commercial objects because that's what the other parts of the statute provide. Now, that's not perhaps going to turn out to be relevant to the decision. I grant you that, but I, I, it's something I'm, I'm like to have in my mind. Okay. The, the distinction under the Foreign Sovereign Immunity, let's put it this way. They want to cabin us into section 1610a7, which is the commercial use exception for property owned by the State. That provision, as the Seventh Circuit held, requires not just use for a commercial activity, but it has to be used by the foreign State, and a number of courts of appeal have held, as did the Seventh Circuit, and this Court did not accept review of this issue, that, that it has to be, that the use must be by the foreign State itself, even though that's not in the, those words are not in the statute. But a number of courts of appeal have looked at financial assets. Let's take, you know, proceeds of a, of a commercial transaction between a State and private parties. There are proceeds that are held in an account that are intended for the foreign State, and the courts have said that's not commercial use property. Why? Not because it's the proceeds of a commercial transaction, but because those proceeds have not yet been used by the foreign State for commercial activity. They're just sitting in an account passively waiting to be used, but they haven't been used yet, and the State could say we're going to put it in our general account in the treasury. Sotomayor, and those courts may well be wrong. I don't know. What I'm saying is, is the practical difference between our construction and the Respondent's construction is not antiquities. It's all of these cases dealing with, with passive bank accounts. There's another case in California where there was a judgment obtained by the Ministry of Defense of Iran against a defense contractor, and the court said the money paid by, by the Ministry of Defense, that's not commercial use property because it hasn't been used by Iran. There's count, there are countless cases like this, and this is the body, these are the, these are the, the, the cases that this provision is, is, or one group of cases that this provision is intended to cover. It's not intended to cover antiquities, and I don't think there's going to be a, a mad rush to grab antiquities. Breyer. You and yourself in this case, that's what it is, isn't it? That's all that they've left. That's all, this, this proceeding below began in 2003. The, the terror attack in this case was in 1997. My clients have been waiting 20 years to enforce their judgment against Iran. Iran does not pay judgments. You know, you know, it's not Argentina that can't afford to pay the judgment. They just don't. And they don't, they don't care what the American courts say. And Congress finally said enough is enough. And, and they said there's punitive damages, and we're going to waive res judicata, we're going to waive collateral estoppel, we're going to waive statutes of limitations. You can go back and convert your old judgments into a new 1605a judgment and use, and use that tool under 1610g, under our provision, to enforce it. Congress said enough is enough. We want these judgments enforced. And it's not about antiquities. That's, that's, that's what the Respondents are writing about. But they will not tell you what the, what the property of a foreign State applies to. The United States doesn't. Ginsburg. Is there anything in the legislative record that shows that Congress was intending to do anything other than dispense with the bank check? Verrilli, Yes. It says that it applies, that the provision will apply to any property on which the foreign State has a beneficial ownership. That any property in which the foreign State has a beneficial ownership is subject to execution of that judgment. It says the, the, the Senate sponsors said that it is intended to remove many of the barriers to execution of a judgment, and according to the Respondents, it only addresses one of those barriers. It says that the, the right to the, to the property is subject to a simple ownership test, a simple ownership test. When you start piercing veils and layers of veils, that is not a simple ownership test. That might have been intended to be included in the ownership, but that's not what was being addressed. And finally, what the, what the statute does say, the legislative history of the House report says that although this subjects to execution any property in which the State has a beneficial interest, it does not extend to diplomatic property. So once Congress is excluding specifically that narrow class of quintessentially sovereign property, diplomatic property, you know that it's extending to, it covers everything else. There's no reason if it didn't cover commercial use property or noncommercial use property, there's no reason to specifically mention diplomatic property, because obviously that's going to be included in noncommercial. This applies to everything, everything except diplomatic, military, and certain central bank assets. The idea that, that Congress would be concerned with affronting the dignity of a State sponsor of terrorism and would extend protection to their noncommercial assets for that reason, to avoid an affront to their dignity, is just preposterous. Ginsburg-Miller Do you have any other section that dispenses with sovereign immunity that doesn't mention, doesn't say anything that refers to immunity? Kennedy Well, I mentioned section 1610F1. It says that the property shall be subject to execution, and the TRIA, the Terrorism Risk Insurance Act, which is a note, I don't think I included it as an oversight in the statutory appendix, but it's codified as a note to section 1610, and that provision, these are the three terrorism provision, execution immunity provisions of the Foreign Sovereign Immunity Act, and not one of them uses the word immunity. It says that we're abrogating immunity here, we're limiting immunity, because again, it's not abrogating it wholesale, it's maintaining a skeletal remain of sovereign immunity, because in recognition of the fact that these States are sovereign. Alito In your brief, you offered several other interpretations of the phrase as provided in this section, interpretations that are different from the one you provided this morning. Are you disavowing those now? Kennedy I think that the best construction is that it refers to the judgment entered under 1605A. I think that those are alternative constructions that are viable and certainly more viable than the Seventh Circuit. Again, if you sit down and try to think of cases where the property of a foreign State will have applicability under 1610G, where this property wouldn't be subject to execution under 1610A.7, right, according to the Respondent's construction, you won't find it. You will not come up with a case where you're going to have to work very, very hard in it. There's no reason Congress would have included it. If this were only meant to pierce a veil, Congress would have said subject to subsection 3 or paragraph 3, the property of an agency or instrumentality of a foreign State against which a judgment has been entered under 1605A is subject to execution to attachment execution. It did not need to mention the property of the foreign State. Iran and the government both talk about how it had to mention the foreign State. Well, it's true, it had to mention the foreign State because a judgment was entered against the foreign State. But it does not need to single out the property of the foreign State if all this were, was a veil-piercing mechanism. It doesn't work. It doesn't you cannot pierce the veil of a company or a country to reach the property the country owns directly. Now, let me just point out that none of the other provisions of 1610 work with G either. B, which the Seventh Circuit relied on, it said this section refers to subsection A and B. Subsection B applies only where there is a judgment entered against the agency or instrumentality. If you have a judgment against the agency or instrumentality, you don't need a veil-piercing mechanism to reach it because you go after, you go after its property directly. C is specifically mentioned to A and B only. That is, an execution referenced under A and B, and it doesn't mention G. And Congress could have amended it to include executions under G. D is for prejudgment attachment where there is an express waiver of immunity. None of these provisions work. I'm going to, I'd like to reserve the rest of my time for rebuttal, but if you, if you sit down and try to, they don't work. It just doesn't, there's no way to read it, according to the Seventh Circuit, and, and apply it. Roberts. Thank you, counsel. Mr. Strauss. Thank you, Mr. Chief Justice, and may it please the Court, let me first pick up on a piece of the legislative history that my friend quoted to the Court. Senator Specter, who introduced the precursor of what became 1610G, did say that, as Mr. Perl had said, that the provision was designed to eliminate many of the barriers which have prevented U.S. citizens from collecting on court-ordered damages. He then said it does this by changing the legal standard of the Banquet Doctrine. So that was the way in which this exposed more, asked more property to execution by terrorism plaintiffs. In fact, the Petitioner's position about the construction of 1610G is wrong for four independently sufficient reasons. One is the language the Court is focused on, as provided in this section. This section, the section 1610, that is the section of which G is a subsection. So the phrase, as provided in this section, means the Petitioners have to satisfy the provisions of section 1610, which means that only property used for commercial activity in the United States can be seized. And Petitioners, I think, have just not come up with a plausible alternative account of what as provided in this section means. But there's a second reason, and it has to do with the difference between subsection G and the provisions of subsection 1610 that really do abrogate sovereign immunity. The Foreign Sovereign Immunities Act says in section 1609 that the property of foreign states in the U.S. shall be immune from attachment, except as provided in 1610. Then the subsections of 1610 say in terms, one after another, that certain property shall not be immune. Subsection A says that, as does B, as does D, as does E. Subsection G contains no such language. The relevant part of subsection G does not refer to immunity at all. And there's a reason for that. The reason is that G is about Bank Act, and the Bank Act doctrine is not an immunity doctrine. The Court was very explicit about that in the decision, the Bank Act decision itself. Roberts. Well, you do think, agree with him, don't you, that the property of a foreign state in G-1 is a strong indication at least that it is not limited to overturning the Banchek decision? No, I don't agree with that, Mr. Chief Justice. I think what's going on there is Congress wanted to make it very clear that Banchek was no longer going to be a barrier in these cases. And so it said property of the State, property of agencies, property of instrumentalities, property of separatoritical entities, interests in separatoritical entities, all of these things are in the same basket, and all of them are subject to attachment and execution. I think that's why you have that language in G-1. It's not a fact. But Banchek wasn't about property of a foreign state. It was about the agencies, instrumentalities, et cetera. It's right that Banchek was not about the property of a State itself. But the way the section is written, property of a State, including property that is in a separatoritical entity or is an interest held directly or indirectly in a separatoritical entity, what you see in the legislative history is a lot of concern that State judgment debtors would be arranging their assets in ways that would distance themselves from ownership. Breyer. Is it the case there on that particular point? I was trying to work out that. Does Banchek ever apply? Could it apply to funds or funds of the foreign state itself? Is there anything that suggests it applies with a foreign state deposits of money in a bank? And then they argue, we, that isn't our money, that's the bank's money, and we're just the beneficial owner of that money. And Banchek might have said, yes, that's right, it's not their money, it's an agency, it's an agent's money. I'll say two things to that, Justice Breyer. I think the Banchek criteria are not very clear. The Court deliberately left the criteria vague. And I think Congress was concerned about that situation. And I think that's why you see this language in G-1 that really tries to be comprehensive and cover every base. But what I think you don't get out of G-1 is anything about immunity, because it even applies to separate juridical entities who have no contingency. Well, it doesn't want to cover everything in every case. It's titled property in certain actions. And I think the argument on the other side is that the certain actions are, you know, the ones in — don't include the ones governing the property of the foreign state. Well, I think the certain actions, Mr. Chief Justice, are actions to execute judgments under 1605a. This is a special provision to make it easier for terrorism plaintiffs to get assets. It doesn't apply to ordinary judgment plaintiffs. And I think that's the property it's referring to. This is — really was intended to make it much easier for plaintiffs who have terrorism-based judgments to get their hands on assets, but only those are plaintiffs. And I think those are the actions, and that's why the judgment entered under 1605a. But that doesn't mean that the rest of the section does not apply. In fact, it says the rest of the section does apply upon, as provided in this section. Sotomayor, I think you were cut off on three independent reasons. You went through one and two. What were three and four? Two was the repetition of the repetition of shall not be immune. The third is this. The Petitioner's position really would nullify a decision Congress made at the very same time it enacted 1610g in 2008. This is — we go through this on page 25 and 26 of our brief. The statute that added subsection g also created 1605, the cause of action that — the remedy that Petitioners invoke. That statute then amended the FSIA to say that parties like Petitioners, who are seeking to execute a 1605a judgment, must show that the property they want to seize is used for commercial activity in the United States. That same statute said that. It said that by inserting 1605a into subsection a. Which is a subsection that requires commercial activity. So Congress did that. It created 1605, 1605A. It said if you have a — if you are trying to execute a 1605A judgment, here is how you do it. Section — you go to section — subsection a, subsection a7 says you can execute a 1605a judgment provided you can show that the property is used for commercial activity in the United States. That's what that statute does. Then the next provision, or a few lines later in the statute, really it's not even the next provision, sets up and acts subsection g. So as Petitioners would have it, Congress created this remedy, provided that if you want to execute a judgment based on this remedy, you go to subsection a and you show that the property you are seizing is used for commercial purpose, commercial activity in the United States. And then immediately Congress said, oh, never mind, you don't have to show commercial activity. That's Petitioner's story. That's Petitioner's account of the significance of 1610G. And I think that's just no way to read Congress's actions. That just does not — is not a plausible account of what Congress might have been doing. And there's really a fourth reason as well, and it has to do with how central the commercial activity limit is to the FSIA and to foreign sovereign immunity generally. The principle at stake here is the principle that commercial property may sometimes be subject to seizure, but noncommercial property is not. And that principle is — has the deepest roots in U.S. law and international law. It's actually anticipated by Chief Justice Marshall's opinion in the Schooner Exchange. It was the foundation of the Tate letter, which led to the reorganization of foreign sovereign immunity doctrines. That distinction between commercial and noncommercial property is stated explicitly in the FSIA itself in Section 1602. It's central to the U.N. Convention on the Immunities of States. It was the holding of a recent decision of the International Court of Justice, which barred the seizure of, as it happens, a cultural center. The ICJ barred the seizure of a cultural center because the cultural center is noncommercial. And that case actually involved the victims of Nazi crimes. So this is an extremely deeply rooted principle. Now, that's not to say Congress could not abrogate it. Of course, Congress could. But the Court said just last term in Helmerich, the case involving the Venezuelan seizure of oil rings, that the Court is not going to assume that Congress has made a, quote, in the Court's words, radical departure from central principles like that one unless Congress has made its determination very clear. And here, what's really very clear is the opposite, that Congress did not intend to do that, and that's why it's not in the statute in Section 1610g. If the Court has no further questions. Thank you, counsel. Thank you very much. Mr. Tripp. Mr. Chief Justice, and may it please the Court, these ancient Persian artifacts are immune from execution under 1609, and nothing in 1610g lifts that immunity. And if I could just make three quick points about why that's right. The first, as most of the questioning has already been focused on today, is it just can't be squared with the statutory text. The statute says that the property of these different entities is subject to execution, quote, as provided in this section. But the way Petitioners read it, it would work exactly the same way if it said the exact opposite, if it said that the property was subject to execution regardless of what is provided in the section, and that just can't be right. And so, second, I think another thing that really drives home that they're misreading this law is that the way they read it, it gives with one hand what it takes away with another. So as my brother was explaining, Congress added g, at the same time it added a7. And what a7 says is that these very same people, victims of terrorism with judgments under 1605, capital A, it says that they can execute against the property of a foreign state, but only if it's used in commercial activity. But the way they read g, those people can defeat that limitation just by invoking a different subsection of the same statute. They can get commercial, noncommercial property, whatever. And that's just not a sensible way to draft a statute. Sotomayor, don't they explain a7 as being present to permit State law claims based on the same actions as the Federal action? That would render a7. So we don't think that's right. We also just don't think it really helps them. I know you're saying it, but explain to me why. Yes. So the reason it's not right, we explain this at pages 24 and 25 of our brief. It has to do with the language of 1605bigA itself. This is on 12a of our gray brief, if you want to see it. And what 1605bigA says is, quote, the court shall hear a claim under this section if and then the prerequisites to jurisdiction are satisfied. So we think any time a court gets jurisdiction and enters a judgment, it's a judgment under 1605bigA, regardless of what cause of action they happen to invoke. I also think this doesn't really move the dial for them much, because in practice, in the mine run application of 1605bigA, when somebody gets jurisdiction, they're also going to use the cause of action. As Petitioners were describing, it's very powerful. It's directly on point, punitive damages, vicarious liability. And so it'd still be true that in the mine run application of G, they would be reading the law to give with one hand what it takes away with the other. And then the last thing I'd just like to mention here is about the United States competing interest in this case. I mean, obviously we have a very strong interest in combating state sponsored terrorism. We also have concerns in these cases about the reciprocal treatment of our own property abroad. And I think particularly in light of those concerns, which are quite weighty, if Congress was really going to take the step of allowing execution against property of a cultural and historic significance to another country and its people, that would be a big deal and it would not be the kind of thing you would expect to see buried in a conforming amendment without remark. Sotomayor, Well, how about the cases, the other cases he was talking about, the ones with proceeds in the bank from a commercial activity, et cetera? His reading would take care of those rulings, wouldn't it? So I think one thing about the way we read the statute, too, I think it does help to some extent with the breadth of the use in commercial activity, is that the way we read G, once you – if you have a judgment against a foreign state, you can pierce the veil down through to the agency or instrumentality, and then you can go after the agency or instrumentality's property under B-3, and B-3 does not require that the property be used in commercial activity. It's enough that the instrumentality is engaged in commercial activity. So you think those other courts were wrong? Those other – I believe the other decisions that he was talking about were interpreted in A-7, not B-3. And so – but as we understand it, the statute works together with all of it. It works – 1610, you can pierce the veil and use A, B, the procedures in C would apply, D could apply, F could apply if it weren't waived. And so I think a natural way for Congress to pick up all of those – all of those procedures was to say that the property is subject to execution as provided in this section. And so what Congress did was to tether the extent of execution under this veil-piercing provision to all the protections that are already baked in elsewhere in 1610, and those protections ensure that you can't execute against the ancient Persian artifacts like these. So if there's no further questions, we're asking the Court to affirm. Roberts. Thank you, counsel. Mr. Perlin, you have 5 minutes remaining. The first point I want to make is that the government and the university claim that our reading would render this – would render subsections A-7 and B-3 superfluous. That's not the case. The private right of action under section 1605Ac applies only where the plaintiffs are U.S. nationals, members of the military, or government contractors or employees. The immunity waiver that's also in 1605A, but subsection A, so 1605A, A, lowercase A, applies where the claimant or the victim is a U.S. national, a member of the military or government employee or contractor. It's a – it applies to a broad – the immunity waiver reaches a broader class of plaintiffs. The remedy provided under 1610G is limited to those who hold judgments under 1605A, and this judgment that's available under 1605A is a – is the statutory judgment. The provisions of 1610A-7 and B-3 apply where the judgment relates to a claim for which the foreign state is not immune under 1605A, which is explicitly referring to the immunity exception, and it's explicitly referring to the broader class of plaintiffs. So we don't think that there's – there is some overlap, but that does not render A and B superfluous. Second of all, B, as Iran argues, and they argued below in the Bennett case, which is case 16-334, I believe, there was a case where Visa had collected money for a bank millie, a bank, an Iranian bank, and was holding it because of the sanctions. It could not return that, could not pay that money out. Terrorism victims came and said, we want to – we want to enforce a judgment against that money that Visa collected on behalf of Bank Millie, and Visa filed an interpleader action. Iran defended, and they said, you can't – you cannot enforce your judgment under 1610B-3, because that applies only where the judgment is entered against the instrument – the agency or instrumentality, and Bank Millie, there is no judgment here. That's what Iran's argument was. The – and, right, Iran continues to maintain that it won't apply to B-3, and I think that that's – I mean, that's – you would have to say that you would have to read out of B-3 the limitation that you need a judgment against the agency or instrumentality for it to apply to B-3. Again, there is – there is no way to read this through according to their construction, to read it through and apply it. Now, again, just to make clear the point about the – as provided – upon a judgment as provided in this section, if you look at the other substantive provisions of 1610, they allow – let's start with – let's look at 1610A. The opening paragraph says that the property of a foreign state used for commercial activity in the United States shall not be immune from attachment or from execution upon a judgment entered by a court of the United States, right? There's execution, comma, upon a judgment, and then words that modify the judgment. Same thing in subsection B. It's the exact same structure. Subsection F, it's not the exact same words, but it's the same structure again, that – that the property is subject to execution of any judgment relating to a claim for which the State is not immune. Again, the words following judgment are modifying the word judgment, which makes sense under the last antecedent rule, and it also makes sense here because we're talking about a particular judgment. Section 1610G applies to a particular judgment. The word execution is separated from that phrase by a comma. The words upon that judgment as provided in this section do not contain a comma. Those words are meant to be read together, and the as provided in this section is modifying the word judgment. The U.S. concerns about foreign – about foreign relations are misplaced. The explicit purpose, one of the explicit purposes of the Foreign Sovereign Immunities Act was to remove foreign sovereign immunity decisions from the executive branch and place it with the courts, and that was for two reasons. One, that plaintiffs, American plaintiffs, were being treated unequally based on whatever policy consideration was relevant at the time. And two, the government was subject to foreign pressure. So to remove this pressure from the government, Congress placed this authority in the hands of the courts rather than the government. Thank you, counsel. The case is submitted.